TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-11-00188-CV






Rudolph "Rudy" A. Schlais, Jr., Individually and as Legal Representative for
Cyrill Eltschinger, Reiko Yuan, Laura Ning, Sean Zhao, Charles Zhang, and Ray Yang,
Appellants


v.


Valores Corporativos Softtek, S.A. de C.V., Appellee






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 126TH JUDICIAL DISTRICT

NO. D-1-GN-08-003878, HONORABLE SCOTT H. JENKINS, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N


 The appellants are former shareholders in a foreign holding company that was
acquired by another foreign holding company, Valores Corporativos Softtek, S.A. de C.V. ("VCS"). 
The former shareholders, all of whom are non-Texas residents, sued VCS in Texas for allegedly
breaching the payment provisions in the acquisition agreement. VCS filed a special appearance
contesting personal jurisdiction, which the trial court sustained after determining that VCS's contacts
with Texas were insufficient to confer either specific or general jurisdiction. We will affirm.


FACTUAL AND PROCEDURAL BACKGROUND (1)

 VCS, a Mexico corporation, agreed to purchase all of the outstanding shares of stock
of Information Technology United Corporation B.V.I. ("ITU"), a British Virgin Islands corporation
with a China-based wholly-owned subsidiary that provided information technology outsourcing
services ("ITU Hong Kong"). To consummate the transaction, VCS executed a share purchase
agreement ("SPA") with ITU's shareholders--Rudolph A. Schlais, Jr., Cyrill Eltschinger, Reiko
Yuan, Laura Ning, Sean Zhao, Charles Zhang, and Ray Yang (collectively "the ITU Shareholders"). 
The purchase transaction was closed in Monterrey, Nuevo Leon, Mexico. The SPA specified a total
purchase price of approximately $8.9 million (2) to be paid in the following manner: (1) $2.5 million
to be paid at the time of closing in cash and in shares of stock in VCS's parent company, Infosoft,
S.A. de C.V. ("Infosoft"); (2) $1.25 million in Infosoft stock to be paid on the first anniversary of
the closing date; (3) $1.35 million in Infosoft stock to be paid on the second anniversary of the
closing date; and (4) two performance-based cash payments calculated by applying specified
multipliers to ITU's 2007 and 2008 consolidated EBITDA (earnings before interest, taxes,
depreciation, and amortization) results. (3)

The precise date the performance-based payments were due is not specified in the SPA, but the
agreement states that "the final Purchase Price may increase or decrease" based on ITU's "real
2007 and 2008 consolidated EBITDA results." The performance-based payments were also
expressly made contingent on the continued employment of one of the plaintiffs, Eltschinger, and
other unspecified "key management" employees until the entire purchase price had been paid. The
SPA did not identify a particular location for remitting the purchase-price payments and instead
required that the payments be made as instructed by the ITU Shareholders. At the close of the
transaction, ITU and its China-based subsidiary became wholly-owned subsidiaries of VCS and were
collectively referred to by VCS and its subsidiaries as "Softek China." (4)

 When the first anniversary of the closing date arrived, VCS failed to make the
requisite anniversary payment. VCS contended that no performance-based payment was owed due
to ITU's negative EBITDA results and that the terms of the performance-based payment provisions
authorized VCS to apply the relevant multipliers to negative EBITDA results and offset that amount
against the required anniversary payment amounts, essentially creating a "negative bonus." Although
the ITU Shareholders did not dispute that VCS owed no performance-based payment under
subsections 4.02(4) and 4.02(5) of the SPA, the ITU Shareholders disagreed with VCS's
interpretation of the alleged interplay between the SPA's performance-based-payment provisions and
the anniversary-payment provisions. Because the parties were unable to reach an accord, the ITU
shareholders sued VCS in Texas seeking monetary damages for breach of contract and a declaration
of their rights under the SPA. When VCS similarly declined to make the second anniversary
payment in full, the ITU shareholders amended their petition, alleging that this failure constituted
an additional breach of the SPA. (5)

 In addition to generally denying ITU's allegations, VCS filed a special appearance
contesting personal jurisdiction. Although VCS is a foreign corporation that does not itself directly
provide goods or services to clients in Texas, (6) the ITU Shareholders asserted that jurisdiction was
proper in Texas based on VCS's actual and imputed contacts with Texas. Among other things, the
ITU Shareholders alleged that VCS intentionally directed activities to this forum and derived profits
from Texas residents. In particular, the ITU Shareholders asserted that the SPA was partially
performable in Texas because (1) VCS acquired the stock in ITU to gain access to revenues
from ITU Hong Kong's largest client, Texas-based Dell Computer, Inc. ("Dell"); (2) a large portion
of the revenues on which any performance-based payment would be based originated from ITU Hong
Kong's Texas clients, including Dell; (3) the performance-based payments were expressly contingent
on the continued employment of one of the plaintiffs, Eltschinger, and he was contractually
incentivized to retain "top clients", which necessarily included Dell; (7) and (4) the SPA included
choice-of-law and mediation provisions requiring the application of Texas law and arbitration rules. (8) 
In addition, the ITU Shareholders asserted that VCS and its wholly-owned, indirect subsidiary,
Softek Integration Systems, Inc. ("SIS"), a Delaware corporation doing business in Texas,
should be fused for jurisdictional purposes based on agency principles and on alter-ego and
single-business-enterprise corporate-veil-piercing theories. The ITU Shareholders further pointed
to a number of other contacts between VCS and Texas, including that VCS and its subsidiaries
operate globally under the common trade name "Softek," VCS advertises to the public that "Softek"
does business in Texas and maintains offices in Texas, VCS has licensed the use of "Softek"
trademarks to its subsidiaries for use in Texas, VCS used Texas lawyers to represent it in unrelated
proceedings before the U.S. Patent and Trademark Office ("USPTO"), VCS's filings with the
USPTO stated that VCS has maintained offices in Houston and Austin, and VCS had a single,
dormant bank account in Texas.

 After an evidentiary hearing on VCS's special appearance, the trial court sustained
the special appearance and dismissed the ITU Shareholders' claims with prejudice to refiling in
Texas. The trial court subsequently issued findings of fact and conclusions of law, determining that
neither specific nor general jurisdiction could be exercised over VCS in Texas.

 On appeal to this Court, the ITU Shareholders challenge the trial court's dismissal
order on the grounds that (1) a Texas court may properly exercise specific jurisdiction over VCS
because there is a substantial connection between VCS's contacts with Texas and the operative facts
of the underlying dispute; (2) general jurisdiction exists over VCS because the Texas business VCS
directly contracted with the ITU Shareholders to perform in Texas was continuous and systematic;
and (3) general jurisdiction exists because VCS's indirect subsidiary, SIS, has extensive contacts
with Texas that must be imputed to VCS under agency and corporate-veil-piercing theories. The
ITU Shareholders further challenge the legal and factual sufficiency of the evidence to support
several of the trial court's fact findings underlying the court's conclusion that neither specific nor
general jurisdiction exists.

DISCUSSION

 As the plaintiffs, the ITU Shareholders bore the initial burden of pleading
sufficient facts to invoke personal jurisdiction over VCS. See Moki Mac River Expeditions v. Drugg,
221 S.W.3d 569, 574 (Tex. 2007). VCS then assumed the burden of negating all forms of personal
jurisdiction alleged, see id., but the ITU Shareholders bore the burden of proving any allegations
seeking to pierce the corporate veil. See BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789,
798 (Tex. 2002). Whether, based on the facts, a court can exercise personal jurisdiction over a
nonresident defendant is ultimately a question of law that is reviewed de novo, as are the trial court's
underlying legal conclusions. Moki Mac, 221 S.W.3d at 574; BMC Software, 83 S.W.3d at 794. 
Subsidiary fact findings, however, are reviewed for legal and factual sufficiency. BMC Software,
83 S.W.3d at 794.

 In reviewing a legal-sufficiency challenge to the trial court's fact findings, we view
the evidence in the light most favorable to the challenged finding and indulge every reasonable
inference that would support it. City of Keller v. Wilson, 168 S.W.3d 802, 822, 827 (Tex. 2005). 
When a party challenges the legal sufficiency of the evidence supporting an adverse finding on an
issue on which an opposing party bears the burden of proof, the challenge must be sustained when
(1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or
of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence
offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence conclusively
establishes the opposite of the vital fact. Service Corp. Int'l v. Guerra, 348 S.W.3d 221, 228 (Tex.
2011). More than a scintilla of evidence exists to support a finding if the evidence would allow
reasonable and fair-minded people to differ in their conclusions. Id. Conversely, evidence
conclusively establishes a vital fact when the evidence is such that reasonable people could not
disagree in their conclusions. See City of Keller, 168 S.W.3d at 814-17. When a party challenges
the legal sufficiency of the evidence supporting an adverse finding on an issue on which it has the
burden of proof, that party can prevail only if it demonstrates that the evidence conclusively
establishes all vital facts in support of the issue. Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241
(Tex. 2001).

 In reviewing a factual-sufficiency challenge, we examine the entire record and
consider and weigh all the evidence, both in support of and contrary to the challenged finding. Ortiz
v. Jones, 917 S.W.2d 770, 772 (Tex. 1996). When a party attacks the factual sufficiency of an
adverse finding as to an issue on which it did not have the burden of proof, we set aside the finding
only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). When a party attacks the factual sufficiency of an
adverse finding on an issue on which it had the burden of proof, it must demonstrate on appeal that
the adverse finding is against the great weight and preponderance of the evidence. Urista v. Bed,
Bath & Beyond, Inc., 245 S.W.3d 591, 601 (Tex. App.--Houston [1st Dist.] 2007, no pet.).

 Once it is determined that the trial court's findings are supported by sufficient
evidence, or if the material facts are undisputed, whether those facts negate all bases for personal
jurisdiction is a question of law. See BMC Software, 83 S.W.3d at 794.


Personal Jurisdiction

 Texas courts may assert personal jurisdiction over a nonresident if (1) the Texas long-arm statute authorizes the exercise of jurisdiction, and (2) the exercise of jurisdiction comports
with federal and state constitutional due-process guarantees. Moki Mac, 221 S.W.3d at 574. Our
long-arm statute contains broad language allowing the exercise of jurisdiction over a nonresident
who "does business in this state." Tex. Civ. Prac. & Rem. Code Ann. § 17.042 (West 2008); see
also id. § 17.043 (West 2008) (concerning service of process in actions arising from nonresident's
business in Texas). The Texas Supreme Court has construed the statute's doing-business language
to "'reach as far as the federal constitutional requirements of due process will allow.'" Moki Mac,
221 S.W.3d at 575 (quoting Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,
815 S.W.2d 223, 226 (Tex. 1991)).

 Applying federal due-process principles, it is well settled that personal jurisdiction
is proper in Texas only if the nonresident defendant has established minimum contacts with this state
and the exercise of jurisdiction over the defendant comports with "'traditional notions of fair play
and substantial justice.'" Id. (quoting International Shoe v. Washington, 326 U.S. 310, 316 (1945)). 
The minimum-contacts requirement will be satisfied in this case if VCS has "'purposefully avail[ed]
itself of the privilege of conducting activities within [Texas], thus invoking the benefits and
protections of its laws.'" Id. (quoting Hanson v. Denckla, 357 U.S. 235, 253 (1958)). The hallmark
of the "purposeful availment" inquiry is foreseeability that "the defendant's conduct and connection
with the forum State are such that he should reasonably anticipate being haled into court there." 
World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980); see American Type Culture
Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex. 2002) ("The defendant's activities, whether
they consist of direct acts within Texas or conduct outside Texas, must justify a conclusion that the
defendant could reasonably anticipate being called into a Texas court."). Under this standard, a
nonresident defendant must have "fair warning that a particular activity may subject [the defendant]
to the jurisdiction of a foreign sovereign." Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472
(1985) (quotations omitted). The foreseeability requirement ensures "a degree of predictability to
the legal system that allows potential defendants to structure their primary conduct with some
minimum assurance as to where that conduct will and will not render them liable to suit." Id. As delineated in Michiana Easy Livin' Country, Inc. v. Holten, a triad of limitations
circumscribes the "purposeful availment" inquiry: (1) we may only consider VCS's contacts with
Texas and not the unilateral activity of another party or a third person; (2) the relevant contacts "must
be purposeful rather than random, fortuitous, or attenuated"; and (3) VCS must have sought "some
benefit, advantage or profit by 'availing' itself of [this] jurisdiction." 168 S.W.3d 784-85 (Tex.
2005); see also Moki Mac, 221 S.W.3d at 575.

 If minimum contacts with the forum state are established, those contacts may give
rise to two types of personal jurisdiction--specific jurisdiction and general jurisdiction. Specific
jurisdiction exists if the defendant's alleged liability "'aris[es] out of or [is] related to'" the
defendant's forum-state contacts. Moki Mac, 221 S.W.3d at 575 (alterations in original). If the
defendant's contacts are continuous and systematic, general jurisdiction is established regardless of
whether the defendant's alleged liability arises from those contacts. Id. The ITU Shareholders
contend that both specific and general jurisdiction are established in this case.

Specific Jurisdiction 

 The ITU Shareholders assert a number of contacts between VCS and Texas that
allegedly give rise to personal jurisdiction over VCS. However, the only contacts with Texas that
the shareholders contend confer specific jurisdiction in this case are those that originate by and
through the SPA. Therefore, our specific-jurisdiction analysis focuses exclusively on whether the
SPA and the relationship it created and governs constitute minimum contacts with Texas and
whether the operative facts of the underlying litigation arise from or are related to those contacts. 

 The ITU Shareholders assert that VCS established minimum contacts with Texas by
acquiring ITU and ITU Hong Kong, which at the time of acquisition derived a significant portion
of its revenues from providing IT outsourcing services to Texas-based clients. According to the ITU
Shareholders, VCS purposefully availed itself of the privilege of conducting activities in Texas and
directly conducts business in Texas because it executed the SPA for the purpose of acquiring
ITU Hong Kong's Texas business contacts. The shareholders note that the SPA contains a Texas
choice-of-law provision and that VCS expressly conditioned its purchase of ITU's stock at the stated
contract price on (1) the continued employment of Eltschinger, who in turn was offered a bonus for
retaining "top clients" (which necessarily included Texas-based Dell), and other "key management," (9)
and (2) ITU's achieving an expected degree of profitability, which effectively required ITU (through
the China subsidiary) and its key management to continue generating business in Texas and
maintaining "strategic partnerships" in Texas. For this reason, the ITU Shareholders challenge both
the trial court's conclusion that personal jurisdiction is lacking and the legal and factual sufficiency
of the evidence to support the district court's findings that (1) VCS "does not directly do business
in the state of Texas or with persons or entities located in Texas"; (2) VCS "does not provide
outsourcing services to persons or entities in Texas"; and (3) "[t]he evidence before the court did not
prove that Defendant [VCS] maintained strategic partnerships with persons and entities located
in Texas."

 In support of their argument, the ITU Shareholders cite evidence that is undisputed
or conclusively establishes that at the time the SPA was executed VCS knew that (1) a significant
source of ITU's revenue was generated from Texas-based clients; (2) ITU's China-based subsidiary
had a contractual arrangement with a Texas-based company, Intersys Consulting, Inc. ("Intersys"),
which acted as an intermediary between that subsidiary and Texas-based customers, including Dell,
Hewlett Packard, and Advanced Micro Devices; (3) retention of ITU Hong Kong's "top clients"
would necessitate doing work for Texas-based Dell, including regular calls, emails, and physical
visits to Texas by Eltschinger; and (4) the SPA's performance-based payment provisions (part of the
acquisition price) would likely be applied to revenues generated in part from customers in Texas. 
 In addition, following VCS's acquisition of ITU, VCS's U.S.-based indirect
subsidiary, SIS, entered into a "Teaming Agreement" with Intersys with the stated purpose of
transitioning SIS into the position of providing services directly to Dell. The ITU Shareholders
characterize this transaction as VCS "transfer[ring] ITU's most valuable asset--its business
relationship with Dell--to SIS." This, the ITU Shareholders contend, shows that the SPA was
actually a contract to purchase ITU/ITU Hong Kong's business relationship with Dell and
other Texas companies by allowing VCS's indirect subsidiary to assume a strategic partnership
with Intersys.

 In sum, the shareholders contend that the SPA was effectively a contract for the
performance of work in Texas (at least in part); consequently, they assert that the post-acquisition
entity's contacts with Texas are effectively VCS's contacts and that any claims concerning
performance of the SPA arise out of or relate to VCS's Texas contacts. See Tex. Civ. Prac. & Rem.
Code Ann. § 17.042(1) (specifying contracts to be performed in whole or in part in this state as
coming within long-arm statute's ambit). More particularly, they contend that the dispute in this case
arises out of and relates to VCS's Texas contacts (i.e., the SPA) because VCS invoked the
performance-based payment provisions in declining to make the anniversary payments and because
the performance-based payment provisions rely on EBITDA results, which include revenues from
work the post-acquisition ITU entity performed for Texas-based clients. (10)

 VCS contends that ITU and ITU Hong Kong's post-acquisition activities in Texas
cannot be imputed to VCS based on the SPA because that contract was solely for the purchase of
stock and neither specified nor required any activities to be conducted in Texas. In addition, VCS
asserts that specific jurisdiction does not obtain in this case even if the SPA otherwise constitutes
a forum-state contact, because there is no substantial connection between the alleged breach of the
anniversary-payment provisions and the provisions in the SPA that tangentially involve ITU's future
performance, including anticipated performance in Texas. With regard to the impact of the
"Teaming Agreement" between Intersys and SIS, VCS contends that the "Teaming Agreement"
establishes only an intent to phase Intersys out as an intermediary and further points out that there
is no evidence that ITU/ITU Hong Kong was ever replaced or denied the benefit of its work for
either Intersys or Dell. In addition, VCS notes the absence of evidence or allegation that it was
involved in the execution of the Teaming Agreement or any decisions regarding the relationship
among ITU, Intersys, and Dell.

 We agree with VCS that the ITU Shareholders improperly focus on ITU's contacts
with Texas rather than VCS's contacts with Texas. In effect, the ITU Shareholders are attempting
to impute ITU's contacts to VCS, but they provide neither argument nor evidence that the corporate
veil between the two should be pierced. In conducting a minimum-contacts analysis, we may only
consider VCS's contacts with Texas and not the unilateral activity of another party or a third person. 
Moki Mac, 221 S.W.3d at 575.

 In addition, a contract--even one with a forum-state resident--does not alone
constitute a sufficient "contact" for due process purposes. IRA Res., Inc. v. Griego, 221 S.W.3d 592,
597-98 (Tex. 2007). Rather, in determining whether a contract between two parties constitutes a
forum-state contact, we must evaluate the prior negotiations and contemplated future consequences
of the contract, along with the terms of the contract and the parties' actual course of dealing. Burger
King Corp., 471 U.S. at 479. Considering these factors in this case, the evidence does not support
the conclusion that VCS purposefully established minimum contacts with Texas.

 It is undisputed or conclusively established that (1) the parties to the SPA are foreign
corporations with principal places of business outside the United States; (2) the SPA was executed
and the purchase transaction was closed in Monterrey, Nuevo Leon, Mexico; (3) the SPA was for
the purchase of all outstanding shares of ITU stock, not the provision of goods or services between
VCS and ITU; (4) the SPA does not specify the performance of any activities in Texas; (5) the SPA
does not contain a forum-selection clause but does assign Texas law as the law governing disputes;
(6) the SPA does not specify the location of the stock-purchase payments; (7) none of ITU's "key
management" is a Texas resident; (8) none of ITU's "key management" is employed or maintains
an office in Texas; (9) following acquisition of ITU and the China subsidiary, Eltschinger was
employed as "CEO Softek IT United" in Asia and was not employed to work directly for VCS; and
(10) VCS did not directly provide any services to Dell or other Texas-based clients. There is neither
evidence nor allegation that any of the SPA or employment-contract negotiations took place in
Texas--either in person or through communications directed at Texas. Similarly, there is neither
evidence nor allegation that VCS engaged in communications, negotiations, or subsequent business
dealings with Texas residents in order to execute or perform the SPA. Nor is there evidence or
allegation that VCS is a signatory to the employment agreements of Eltschinger or other key
management. And, although choice-of-law provisions are relevant to the purposeful-availment
analysis, they are not dispositive in determining whether a defendant has purposefully availed itself
of the benefits and protections of a state's laws. Id. at 482 ("such a provision alone would be
insufficient to confer jurisdiction" but taken with other factors might "reinforce[] his deliberate
affiliation with the forum State and the reasonable foreseeability of possible litigation there");
Michiana, 168 S.W.3d at 792 (noting that choice-of-law and forum-selection provisions are relevant
to purposeful-availment inquiry); see also Preussag Aktiengesellschaft v. Coleman, 16 S.W.3d 110,
125 (Tex. App.--Houston [1st Dist.] 2000, pet. dism'd w.o.j.) (choice-of-law provision standing
alone does not "indicate a voluntary submission to the personal jurisdiction of the state's courts in
the absence of an express understanding to that effect"). On this record, we cannot say that the trial
court erred in determining that VCS did not purposefully avail itself of the privilege of conducting
activities within the State of Texas. Nor can we say that the trial court's disputed fact findings are
without sufficient evidentiary support.

 There is no evidence contrary to the trial court's fact finding that the SPA was for the
purchase of stock in a foreign corporation by a foreign corporation. The provisions in the SPA that
the shareholders attempt to tie to the business in Texas do nothing more than operate as
price-adjustment mechanisms for the value of the stock and cannot properly be construed as making
revenues arising from business in Texas the subject matter of the contract. (11) The execution of the
SPA does not give rise to minimum contacts with Texas, nor are ITU's post-acquisition business
activities in Texas attributable to VCS merely because the purchase price of the stock was
conditioned on the actual value of the company meeting the company's expected value. While it
may be true that VCS purchased the shares of stock in ITU with the expectation of deriving a profit
from the acquisition, including some profits derived from the subsidiary's work in Texas, there
would rarely be a case in which a shareholder did not acquire an interest in a corporation without
hoping to achieve some financial or other benefit from the acquisition. We cannot conceive that
such motivation, even if "secured" by financial incentives in the purchase agreement, could satisfy
the minimum contacts standard on the record in this case. See GJP, Inc. v. Ghosh, 251 S.W.3d 854,
869 (Tex. App.--Austin 2008, no pet.) ("The bare fact that a defendant receives some benefit,
advantage, or profit from Texas does not necessarily mean that it has purposefully availed itself of
the state." (citing Michiana, 168 S.W.3d at 788)). Taken to its logical extreme, the ITU
Shareholders' position in this case would result in virtually a per se rule imputing a corporation's
forum-state contacts to a parent company or other shareholders. Such a result is inconsistent with
personal-jurisdiction jurisprudence. See, e.g., Commonwealth Gen. Corp. v. York, 177 S.W.3d 923,
925 (Tex. 2005) ("Stock ownership and the related right of control that stock ownership gives to
stockholders are insufficient to destroy the distinctness of corporate entities for jurisdictional
purposes."); Cappuccitti v. Gulf Indus. Prods., Inc., 222 S.W.3d 468, 481 (Tex. App.--Houston [1st
Dist.] 2007, no pet.) ("In general, a corporation is a separate legal entity that shields its owners and
shareholders from the jurisdiction of a foreign jurisdiction, even if the corporation itself is within the
court's jurisdiction.").

 The ITU Shareholders rely on Zac Smith & Co., Inc. v. Otis Elevator Co.,
734 S.W.2d 662 (Tex. 1987), for the proposition that VCS could establish minimum contacts via a
contract without actually coming to Texas. Zac Smith is distinguishable, however, because the
defendant in that case signed a joint-venture agreement for the purpose of building a hotel in Texas. 
Id. at 665-66. The contract was wholly performable in Texas, and the parties anticipated a profit
from the construction of the hotel in Texas. Id. These actions were directed toward Texas residents,
and negotiations for the construction of the hotel were directed toward Texas. Id. The facts in Zac
Smith are markedly dissimilar from the facts of the present case. Other cases the shareholders rely
on are similarly distinguishable. See KMG Kanal-Muller-Gruppe Deutschland GMBH & Co. KG
v. Davis, 175 S.W.3d 379, 389 (Tex. App.--Houston [1st Dist.] 2005, no pet.) (specific jurisdiction
existed in employment-contract dispute based on defendant's technology licensing contract executed
in Texas with Texas-based company that employed plaintiff, contract required performance in Texas,
and defendant's managing director negotiated Texas plaintiff's employment contract); Intercarga,
S.A. v. Fritz Cos., Inc., No. 14-02-00297-CV, 2003 WL 21402583, at *7 (Tex. App.--Houston [14th
Dist.] June 19, 2003, no pet.) (not designated for publication) (concluding that significant aspects
of contract negotiations occurred in Texas and transactions involved contracts for transportation of
goods from Texas to Ecuador); Santy v. McElroy, No. 03-00-00368-CV, 2001 WL 838400, at *6
(Tex. App.--Austin July 26, 2001, no pet.)(not designated for publication) (concluding that specific
jurisdiction existed based on defendants' numerous ties to Texas regarding Texas real estate
transactions from which defendants directly profited).

 Having considered the terms of the SPA, the nature of the relationship among VCS,
ITU, and Texas, the pleadings, and the evidence in the record, we hold that the trial court did not err
in determining that VCS did not purposefully direct sufficient actions at Texas in connection with
purchasing the stock in ITU to give rise to specific jurisdiction over disputes arising out of the
performance of the SPA. Furthermore, because there is no legal or factual basis for imputing ITU's
or the China subsidiary's post-acquisition contacts to VCS, the trial court's challenged fact findings
are not so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly
unjust. See Cain, 709 S.W.2d at 176. Because we conclude that the alleged contacts giving rise to
specific jurisdiction do not satisfy minimum-contacts requirements, we need not consider whether
the shareholders' claims in this lawsuit arise from or are related to those contacts.


General Jurisdiction

 General jurisdiction may be exercised over a nonresident defendant with continuous
and systematic contacts with this state, without regard to whether the defendant's alleged liability
arises from those contacts. Guardian Royal Exch., 815 S.W.2d at 228. All contacts made up to the
time suit is filed are relevant to the general-jurisdiction inquiry. American Type Culture, 83 S.W.3d
at 804. For general-jurisdiction purposes, we do not view each contact in isolation. All contacts
must be carefully analyzed for proof of a pattern of continuing and systematic activity. Id. at 809. 
We are not concerned with the quantity of contacts but rather the quality of contacts. Id. at 809-10. 
What constitutes continuous and systematic contacts can only be decided on a case-by-case basis. 
Id. at 810.

 In support of their general-jurisdiction argument before the trial court, the ITU
Shareholders cited three categories of "continuous and systematic" contacts by VCS with Texas: 
(1) ITU/ITU Hong Kong's post-acquisition contacts with Texas, imputed to VCS by virtue of the
SPA; (2) SIS's contacts with Texas, imputed to VCS via agency and corporate-veil-piercing theories;
and (3) VCS's own contacts with Texas. On appeal, the ITU Shareholders have abandoned their
pursuit of general jurisdiction based on VCS's own contacts with Texas. Therefore, only the first
and second categories of contacts are at issue on appeal. We have already declined to impute
ITU/ITU Hong Kong's post-acquisition contacts with Texas to VCS based on the SPA;
consequently, we hold that those contacts do not give rise to general jurisdiction over VCS, even if
the post-acquisition contacts of ITU/ITU Hong Kong are continuous and systematic, as the ITU
shareholders allege. (12)

 The remaining category of contacts upon which general jurisdiction is alleged are
those made by VCS's indirect U.S. subsidiary, SIS, which the ITU Shareholders allege are
attributable to VCS based on agency principles and corporate-veil-piercing theories. It is undisputed
that SIS does business in Texas, and the Shareholders contend that the manner in which VCS
operates the "Softtek family of businesses" demonstrates a greater-than-normal amount of control
by a parent of its subsidiaries and "a constant collapsing of the distinctions between the entities." 
The ITU Shareholders therefore challenge the legal and factual sufficiency of the evidence to support
some of the trial court's findings of fact relating to VCS's and SIS's separateness and observance
of corporate formalities and related conclusions of law.


 1. Agency Relationship between SIS and VCS

 The ITU Shareholders contend that SIS has acted as VCS's agent in Texas, and as
a result, SIS's contacts with Texas are effectively VCS's contacts. The shareholders do not specify
whether they are alleging that SIS had actual authority or apparent authority to act on VCS's behalf,
but because there is no evidence of actual authority, we confine our discussion to whether SIS
possessed apparent authority to act on VCS's behalf. Apparent authority arises through the
principal's acts of participation, knowledge, or acquiescence that "'clothe an agent with the indicia
of authority, thus leading a reasonably prudent person to believe that the agent has the authority [he]
purports to exercise.'" Gaines v. Kelly, 235 S.W.3d 179, 183 (Tex. 2007) (quoting Baptist Mem'l
Hosp. Sys. v. Sampson, 969 S.W.2d 945, 948 (Tex. 1998)) (alteration in original). Apparent
authority is based on the acts of the principal and is limited to the scope of authority that is
apparently authorized, viewed from the perspective of a reasonably prudent person using diligence
and discretion to ascertain the agent's authority. Id. Under Texas law, agency is not presumed, and
the party who alleges agency has the burden of proving it. IRA Res., 221 S.W.3d at 597.

 In support of their agency argument, the ITU Shareholders principally cite the actions
of Beni Lopez, SIS's Chief Executive Officer, on behalf of VCS in negotiating certain aspects of the
SPA--including signing the Letter of Intent for the acquisition of ITU's shares as VCS's authorized
representative --and conducting related due diligence. They also point out that Lopez listed his title
on the Letter of Intent, and other documents, as "U.S. Chief Executive Officer." The ITU
Shareholders also cite evidence that Lopez "deliver[ed] the news to Mr. Eltschinger that his
employment was being terminated and announc[ed] the decision to the ITU management team." 
They further rely on Lopez's involvement in attempting to resolve the dispute in this case, including
VCS's admission that in October 2009 Lopez authored a letter on VCS letterhead to Eltschinger and
Schlais stating "Softek's" position on settlement.

 The shareholders also reference other circumstances they contend blur the lines
between SIS and VCS. Specifically, they cite to undisputed evidence that VCS and its subsidiaries
operate under the umbrella of the single trade name, "Softek," and market the Softek corporate
family's combined resources and capabilities under that umbrella without distinguishing among the
various corporate entities in their marketing materials. They contend that using the trade name
created confusion both inside and outside of VCS and its subsidiaries as to which entity was being
referenced. Among other things, they cite testimony from J.R. Carter, Intersys's corporate
representative, that he did not know there was a difference between "Softek" and SIS and thought
SIS was just the legal name for "Softek." Finally, they point to language in SIS's "Teaming
Agreement" with Intersys, which defines "Softek" as SIS for purposes of that contract but which
also contains factually incorrect statements that ITU and ITU Hong Kong are "Softek's" wholly-owned subsidiaries.

 The evidence the ITU Shareholders rely on fails to meet the standard for apparent
agency. Although Lopez is not an officer of VCS, he is a member of VCS's board of directors and
in that role could be authorized to act on behalf of VCS. Admittedly, Lopez's references to himself
as "U.S. Chief Executive Officer"--a position that does not exist in VCS's corporate hierarchy--are
confusing, but given Lopez's role as a VCS director, the trial court could reasonably have concluded
that Lopez was acting in that capacity rather than on behalf of SIS as VCS's agent. There is
sufficient evidence to support a finding that a reasonably prudent person, using diligence and
discretion to ascertain the agent's authority, would not have considered Lopez to be acting for SIS,
a nonsignatory to the SPA, rather than in his capacity as a VCS director.

 With regard to SIS's use of marketing materials under the "Softek" trademark, it is
unclear what aspect of the marketing materials in the record would create the impression that any
of the Softek entities had agency authority to act on behalf of VCS, let alone that SIS in particular
had such authority. While it is true that the use of a common trade name could, in some
circumstances, create the impression of a single company, both Eltschinger and J.R. Carter testified
that it is not uncommon for there to be global brand marketing of related corporations without
distinguishing the separateness of each legal entity in the corporate family. In fact, Eltschinger
testified that ITU operated in a similar manner pre-acquisition. Given the sophisticated nature of the
services that SIS offers its customers, a reasonably prudent person exercising diligence could have
discovered which Softek entity it was dealing with, and there is sufficient evidence to support the
trial court's finding that SIS "often refers to itself by the trade name 'Softek,' but specifies its proper
corporate name in all contracts and legal documents." A mere misstatement of fact in the Teaming
Agreement does not alter this conclusion, especially in the absence of evidence that the misstatement
was material in any respect to the parties' agreement. Although the ITU shareholders contend that
Intersys thought it was dealing with VCS--"the mothership"-- in making the Teaming Agreement,
J.R. Carter actually testified that he believed that SIS was ITU's and ITU Hong Kong's parent
company, not that SIS was acting on VCS's behalf; moreover, there is no indication that Carter
conducted any inquiry regarding Softek's corporate structure or that it was germane to Intersys's
transactions with SIS.

 In sum, the ITU Shareholders did not conclusively establish that SIS acted as VCS's
agent, nor is the trial court's implied finding to the contrary against the great weight and
preponderance of the evidence.


 2. Single-Business Enterprise or Alter Ego 

 A parent company and its subsidiary may be "fused" for jurisdictional purposes if the
plaintiff proves that "the parent controls the internal business operations and affairs of the
subsidiary." BMC Software, 83 S.W.3d at 799. "But the degree of control the parent exercises must
be greater than that normally associated with common ownership and directorship; the evidence must
show that the two entities cease to be separate so that the corporate fiction should be disregarded to
prevent fraud or injustice." Id. A parent company cannot be subjected to personal jurisdiction based
on the local activities of its subsidiary when "the subsidiary's presence in the state is primarily for
the purpose of carrying on its own business and the subsidiary has preserved some semblance of
independence from the parent and is not acting as merely one of its departments . . . ." 4A Charles
Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1069.4 (3d ed. 2002). 
"[T]he party seeking to ascribe one corporation's actions to another by disregarding their distinct
corporate entities [must] prove this allegation, because Texas law presumes that two separate
corporations are distinct entities." PHC-Minden, L.P. v. Kimberly-Clark Corp., 235 S.W.3d 163,
173 (Tex. 2007).

 The ITU Shareholders cite thirteen factors they claim must be considered in
determining whether VCS and SIS operate as a single-business enterprise. Although the Texas
Supreme Court rejected the single-business-enterprise theory of liability in SSP Partners
v. Gladstrong Invs. (USA) Corp., 275 S.W.3d 444, 456 (Tex. 2008), the ITU Shareholders contend
that the theory remains viable for jurisdictional veil-piercing purposes. We disagree. Although
courts have acknowledged that jurisdictional veil-piercing and substantive veil-piercing involve
different elements of proof, see PHC-Minden, 235 S.W.3d at 174; Daimler-Benz Aktiengesellschaft
v. Olson, 21 S.W.3d 707, 721 n.5 (Tex. App.--Austin 2000, pet. dism'd w.o.j.), the theory of
single-business enterprise as a basis for personal jurisdiction has never been endorsed or embraced
by the supreme court. See PHC-Minden, 235 S.W.3d at 173-74. Moreover, even before the theory
was expressly repudiated in Gladstrong, the supreme court had indicated that a more stringent
standard should be applied in the context of jurisdictional veil-piercing, stating that personal
jurisdiction involves due-process considerations that may not be overridden by statute or common
law. Id.

 In that regard, rather than applying the single-business-enterprise factors the ITU
Shareholders cite, the Texas Supreme Court has relied on the following factors in determining
whether a subsidiary is "separate and distinct from its parent corporation for personal jurisdiction
purposes": (1) the amount of the subsidiary's stock owned by the parent corporation; (2) the
existence of separate headquarters; (3) the observance of corporate formalities; and (4) the degree
of the parent's control over the general policy and administration of the subsidiary. Id. at 175 (citing
4A Wright & Miller, Federal Practice & Procedure § 1069.4). Ultimately, the evidence must
establish that the two entities are not factually and legally separate and the corporate veil should
therefore be pierced to prevent fraud or injustice. BMC Software, 83 S.W.3d at 799.

 Parent companies normally exercise at least some control over their subsidiaries, and
"[a] subsidiary corporation will not be regarded as the alter ego of its parent merely because of stock
ownership, a duplication of some or all of the directors or officers, or an exercise of the control that
stock ownership gives to stockholders." Gentry v. Credit Plan Corp. of Houston, 528 S.W.2d 571,
573 (Tex. 1975). The Texas Supreme Court has held that "'[a]ppropriate parental involvement
includes monitoring the subsidiary's performance, supervision of the subsidiary's finance and capital
budget decisions, and articulation of general policies.'" PHC-Minden, 235 S.W.3d at 176 (quoting
16 Moore's Federal Practice § 108.42[3][b]). To pierce the corporate veil in the personal-jurisdiction context, there must be "something beyond the subsidiary's mere presence within the
bosom of the corporate family." Id. (quoting Dickson Marine, Inc. v. Panalpina, Inc., 179 F.3d 331,
338 (5th Cir. 1999)).

 The ITU Shareholders contest the following portions of the trial court's fact findings
relevant to corporate separateness between VCS and SIS:


 5. [VCS] does not operate its subsidiaries as a mere alter ego or single business
enterprise. [VCS] exercises the appropriate level of control incident with its
ownership, but does not control the day-to-day-operations of its subsidiaries.


 . . . .


 14. . . . [SIS] specifies its proper corporate name in all contracts and legal
documents.


 . . . .


 18. [VCS] and its subsidiary [SIS] observe all necessary legal formalities and
. . . operate as distinct legal entities. They maintain separate personnel,
independent boards of directors (with a few, but not all, common
members) . . .  .


 19. While [SIS is] a wholly-owned indirect subsidiary of [VCS], it is a separate,
self-sufficient corporate entity. . . .


 20. In their business transactions with each other, [VCS] and its subsidiary [SIS]
utilize written contracts, provide invoices to each other and document
amounts paid and outstanding balances. The contracts included reasonable
commercial terms, and there was no evidence that the transactions were
designed to systematically benefit one entity over the other.


Some of the challenged fact findings are better characterized as conclusions of law, and we will
review those portions accordingly. See Ray v. Farmers' State Bank, 576 S.W.2d 607, 608 n.1 (Tex.
1979) (trial court's labels not controlling). The shareholders also challenge the trial court's
conclusion "that VCS and SIS are distinct corporate entities, and there is no basis for disregarding
either corporate entity."

 The ITU Shareholders rely on much of the same evidence they cite in support of their
agency theory--Lopez's actions (including inconsistent or inaccurate use of his organizational title),
common use of the "Softek" trade name by VCS's subsidiaries when soliciting and conducting
business, and the erroneous factual recitation in the Teaming Agreement--along with evidence of
inter-company loans between VCS and its subsidiaries and vice-versa (some of which may be
interest free), overlapping directors, and invoicing of customers originating from subsidiaries that
did not provide services to that customer. The ITU shareholders also contend that VCS "assigned"
the Intersys relationship to SIS without any evidence that SIS provided consideration for the
acquisition, further demonstrating VCS's control over the operations of its subsidiaries.

 We conclude that there is sufficient evidence to support the trial court's findings that
VCS and SIS observe legal formalities, have separate personnel, and have independent boards of
directors. Pertinent to the general-jurisdiction analysis are the following unchallenged fact findings: 


 6. The trademarks and trade names [VCS owns] are used in the state of Texas by
[SIS] pursuant to a contractual licensing agreement. They are not directly used in
Texas by [VCS], although its subsidiaries sometimes use materials bearing a
copyright notice from [VCS] in their activities in Texas.


. . . .


 11. [VCS] and its subsidiaries frequently marketed and represented to the public the
global trade name "Softek," describing the locations and activities of all the
companies worldwide under the single trade name or brand "Softtek." In doing so,
both [VCS] and its subsidiary [SIS] represented to the public that "Softek" had
offices and operations in the state of Texas.


. . . .


 18. . . . [VCS and SIS] maintain separate and distinct accounting records. 
Independent auditors prepared annual audits describing the financial interactions
between the companies, which were apparently documented to the satisfaction of the
auditors. The companies also filed separate tax returns.


 19. . . . [SIS] hires and fires its own employees and employs a workforce of
hundreds. It has its own business departments, such as human resources and
accounting, and its own management team. [SIS] is responsible for maintaining its
own financial records, and the employees and officers of [VCS] did not have
authority to transfer funds of [SIS] or make or alter entries in its financial records.


 With regard to the impact of the "Teaming Agreement" between Intersys and SIS, the
shareholders correctly observe that the record is devoid of evidence regarding consideration for SIS's
assuming ITU's or ITU Hong Kong's role in the relationship with Intersys, but the shareholders bore
the burden of establishing the absence of consideration. See BMC Software Belgium, 83 S.W.3d at
798 (plaintiff bears burden of proving any allegations seeking to pierce corporate veil). Moreover,
there is no evidence that ITU/ITU Hong Kong was ever replaced or denied the benefit of its
relationship with Intersys or that VCS directed or participated in the negotiations among Intersys,
SIS, and ITU/ITU Hong Kong. Indeed, per VCS, the Teaming Agreement reflects only an intent to
phase Intersys out as an intermediary, and there is no evidence to the contrary. Finally, the Teaming
Agreement's misstatement of organizational affiliation between SIS and ITU/ITU Hong Kong does
not contradict the trial court's finding that SIS specifies its proper corporate name in all contracts
and legal documents, despite the shareholders' argument to the contrary.

 Although the ITU shareholders make much of the fact that VCS's subsidiaries operate
under the Softek trade name and market themselves as having a collective global presence, the
jurisdictional significance of this fact is diminished by the absence of any evidence that SIS acts to
any degree as a conduit for VCS's goods or services or that VCS conducts significant business
functions by or through SIS. Cf. Daimler-Benz Aktiengesellschaft, 21 S.W.3d at 720-25 (parent
established U.S. subsidiary through whom it sold its products to customers in U.S., licensed its
distinctive trademark to subsidiary which created confusion of identity, and closely supervised and
directed subsidiaries' activities); Mayo Clinic v. Jackson, No. 05-98-00225-CV, 1998 WL 699385,
at *4 (Tex. App.--Dallas Oct. 9, 1998, no pet.) (not designated for publication) (among other
contacts, related entities were using similar trademark as non-resident defendant and were
clearly soliciting business for non-resident defendant to provide medical services directly to
Texas residents).

 There is undisputed evidence of loans of varying amounts and frequencies between
VCS and its subsidiaries, including SIS, but the evidence is uncontroverted that the loans were
properly documented; there is no evidence that the debts were not paid; the loans went both ways
and do not evidence that either entity was consistently undercapitalized; and there is evidence that
the subsidiaries can and have refused requests for inter-company loans. While there is some
indication that at least some loans may have been interest free, the evidence does not greatly
preponderate against the trial court's factual determinations that SIS and VCS used written contracts
to document their business transactions with each other, the contracts included reasonable
commercial terms, and the transactions were not designed to systematically benefit one entity over
the other. The same can be said of the evidence regarding the subsidiaries' invoicing practices. 
First, there is no evidence that any subsidiaries invoiced other companies on VCS's behalf or vice
versa. Second, there is no evidence that the subsidiaries did not have contractual arrangements to
provide such invoicing or secure payment for services rendered.

 In BMC Software, the supreme court held that a parent and subsidiary could not be
"fused" for jurisdictional purposes, even though there was duplication of officers and directors, the
parent referred to its subsidiaries in an annual report, the parent loaned money to the subsidiary to
hedge funds against currency fluctuations, and the parent and subsidiary used the same letterhead
with the "BMC Software" trade name. 83 S.W.3d at 799-800. Likewise, it has been held that the
forum contacts of a subsidiary could not be imputed to a parent when the subsidiary (1) had its own
staff, payroll, accounting department, auditors, and attorneys, (2) kept separate accounting records
and bank accounts, (3) filed separate consolidated tax returns, (4) was managed by a separate board
of directors, even if some of its members also served on the board of directors of the parent, and
(5) was centrally managed by the parent company but had its own offices. Gibraltar Sav. v. LD
Brinkman Corp., 860 F.2d 1275, 1291 (5th Cir. 1988).

 Like these cases, there is no conclusive evidence to support the ITU shareholders'
theory that VCS and SIS were not factually or legally independent of one another or that VCS
controlled the internal business operations of SIS and thereby became SIS's alter ego. To the
contrary, there is ample evidence that the entities observed legal formalities and operated as separate
entities. Based on the evidence admitted at the special-appearance hearing, we also conclude that
the trial court's disputed fact findings are not against the great weight and preponderance of
the evidence.

 For the foregoing reasons, we conclude that the trial court correctly determined that
there is no basis for exercising general jurisdiction over VCS either by piercing the corporate veil
or by applying agency principles.


CONCLUSION

 The record contains sufficient evidence to support the trial court's conclusion that
VCS lacked sufficient minimum contacts with Texas and is therefore not amenable to personal
jurisdiction in this State. The court's judgment dismissing the case against VCS for lack of personal
jurisdiction is affirmed.




 _________________________________________

 J. Woodfin Jones, Chief Justice

Before Chief Justice Jones, Justices Pemberton and Rose

Affirmed

Filed: April 25, 2012

1. The facts recited in this section are undisputed and are taken from the pleadings, the
evidence admitted at the special-appearance hearing, and the trial court's undisputed fact findings.
2. "The aggregate purchase price (the 'Purchase Price') for buying all outstanding shares of
[ITU] . . . shall be $8,900,000.00 (eight million nine hundred thousand United States Dollars)."
3. Section 4.02 of the SPA outlined the "Structure and Payment of the Purchase Price." 
Subsections (4) and (5) described the performance payout as follows:


 (4) In consideration for the Purchase Price, the Buyer will pay the Seller a
performance payout amount equivalent to the result of multiplying 2.75 times the
Corporations [sic] 2007 consolidated EBITDA according to U.S. GAAP.

 

 (5) The Buyer will pay the seller a performance payout amount equivalent to the
result of multiplying 1.50 times the Corporations [sic] 2008 consolidated EBITDA
according to U.S. GAAP.
4. It is unclear what the formal legal names of these entities became after they were acquired
by VCS.
5. While this case was pending in the trial court, VCS initiated a "Consignment Proceeding"
in the Court of Concurrent Jurisdiction in Monterrey, Nuevo Leon, Mexico, and tendered to that
court at least some of the disputed Infosoft stock certificates. The ITU Shareholders contend,
however, that the tender was untimely and insufficient to satisfy the $2.6 million dollars in
anniversary payments due under the SPA's terms. VCS maintains that the SPA calls for the tender
of a specified number of shares and that VCS tendered the precise number required under the SPA's
terms. The current status of the Mexican consignment proceeding is unknown, and the issue of
valuation is not before this Court.
6. The ITU Shareholders contend that VCS effectively provides such services through its
subsidiaries, including ITU, but does not allege that VCS itself actually performs any of the work
for Texas-based clients.
7. Although the SPA states that a draft of the terms and conditions of the employment
agreements with Eltschinger and other key management employees are an "integral part" of the SPA
and are attached to the SPA, there are no such attachments to the SPA that is part of the record in
this case. Eltschinger's job offer letter was separately admitted at the special-appearance hearing and
was apparently executed contemporaneously with the SPA, but the letter states that it is not an
employment agreement. If Eltschinger subsequently executed an employment agreement, that
agreement is not part of the appellate record.
8. The SPA contains two provisions relating to choice of law. The first one, in Article III of
the SPA, entitled "Interpretations," states:


 Applicable Law. This Agreement shall be construed, interpreted and enforced in
accordance with, and the respective rights and obligations of the parties shall
be governed by the laws of the state of Texas of the United States of America
applicable therein.


The second provision, section 11.04 of the SPA, entitled "Governing Law," states:


 This Agreement is governed by the Laws of the States [sic] of Texas of the United
States of America. All contractual disputes between the Parties shall seek settlement
of that dispute by mediation in accordance with the Arbitration Rules of the
corresponding to Texas [sic] or the appropriate Courts of International Arbitration
(LCIA) Mediation Procedure in the United States.
9. The ITU Shareholders make claims about the terms of employment of all of the
unidentified "key management" but focus on Eltschinger specifically and offered only his job-offer
letter at the hearing on VCS's special appearance.
10. It is undisputed that no performance-based payment is due and, therefore, the actual
Texas-based revenues play no part in the disposition of the shareholders' claims against VCS. 
Moreover, VCS has expressly disavowed any intent to claim--at least in this litigation--that the
performance-based-payment provisions can be offset against the anniversary payments due and
payable under the SPA. Although VCS's appellate briefing characterizes the performance-based-payment provisions as "optional," we understand its argument to be that the payments were
"conditional" and were not due unless positive EBITDA results obtained.
11. Furthermore, the contacts with Texas that the ITU Shareholders rely on appear more
attenuated than purposeful. The fact that the SPA's performance-based payments are conditioned
on future financial performance might imply an expectation that business will be obtained from the
existing clients, but does not actually require such a result or require that such result be obtained by
doing business in Texas. Under the terms of the SPA, ITU's performance or nonperformance in
Texas affected, at most, only the acquisition price VCS would be required to pay. Likewise,
although Eltschinger's employment agreement, which is ancillary to the SPA, may provide financial
incentives for retaining existing business, the agreement does not explicitly or implicitly require any
performance in Texas, nor does it condition Eltschinger's continued employment on maintaining
existing business relationships; it merely provides a reward to him if he does. It is not even clear on
this record what essential terms and conditions of Eltschinger's employment were "integral" to the
SPA. Although the SPA states that "[s]igned draft[s] of the terms and conditions of such of [sic]
employment agreements with Key Management" are attached and are "an integral part" of the
agreement, no draft terms and conditions were included with the SPA admitted into evidence. 
12. The ITU Shareholders devote little attention to this theory in their appellate briefing save
for the following conclusory statements in the "Summary of the Argument" portion of the brief: 
"The Texas business that VCS itself--not any of its subsidiaries--contracted for [the ITU
Shareholders] to perform was both continuous and systematic. Thus Texas could properly exercise
general jurisdiction over VCS based on VCS's own conduct."